**IT IS ORDERED as set forth below:**



Date: October 24, 2019

_____
**Wendy L. Hagenau
U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 18-64399-WLH |
| | ) | |
| ARIANE FERREIRA, | ) | CHAPTER 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| AUCTION CREDIT ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ADV. PROC. NO. 18-5264 |
| | ) | |
| ARIANE FERREIRA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER AFTER TRIAL**

Plaintiff's assertion that its judgment is non-dischargeable under §§ 523(a)(4) and (a)(6) came before the Court for trial on October 8, 2019. Both parties were represented by counsel. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157, and this matter is a

1

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). After consideration of the evidence and the law, the Court enters judgment for the Debtor/Defendant.

## FINDINGS OF FACT

Mr. Ferreira started Triple A Auto Brokers, LLC ("Triple A") in 2014. He was at all times the sole member of Triple A. In 2015, Triple A began buying cars at auction, having them repaired, and then reselling them. Plaintiff Auction Credit Enterprises, LLC ("ACE") is a "floor plan" lender. It provided funds to Triple A for the purchase of many of the cars acquired by Triple A. On January 2, 2015, a "Demand Promissory Note and Security Agreement" was signed by ACE as the lender and Mr. Ferreira (the "Debtor") and Triple A as the identified dealer ("Agreement"). The Agreement provided, *inter alia*, for the advance of funds to purchase inventory. The Agreement required Triple A to pay ACE within a short time of the sale of a vehicle. ACE argues that payment had to be made within 24 hours pursuant to Section 7.7 of the Agreement. The Agreement also allowed for payment within 48 hours in some circumstances (Section 2.3(e)) and the Debtor testified he had been allowed up to seven days to make payment after the sale of a car. As the facts unfold below, the Court need not reconcile this inconsistency. The Debtor understood that if he did not sell a car within 30 days, he had to make additional payments to ACE. Another payment was due if the car was not sold within 60 days, and yet another payment was due if a car was not sold within 90 days. Mr. Ferreira individually signed an unlimited and continuing guarantee of the Agreement.

Under the Agreement, ACE was granted a security interest in the vehicles financed by it and also on virtually all property of the "Dealer". The security interest continued in all proceeds and products of the Collateral. The Agreement stated the Dealer remained the owner of the vehicles. No evidence was presented of the perfection of the Plaintiff's security interest, but the Debtor did not dispute that ACE held a security interest in the vehicles. The Debtor also testified

2

that he asked ACE to relinquish certain titles, thereby indicating to the Court that ACE either physically held the title or had placed a lien on the title. The Agreement did not require the Dealer to segregate proceeds from the sale of floor planned vehicles, and Triple A at all times had only one operating account. The business of Triple A had been profitable until August through October 2016, when Triple A's sales decreased. Mr. Ferreira expected the company to return to profitability. Evidence was not presented as to the funds received by Triple A or payments made to ACE, but Triple A and Mr. Ferreira used some funds from the sale of the cars to pay business expenses such as a business license, rent, utilities and the cost of car repairs. Mr. Ferreira also paid himself $500 to $1,000/week – but the total amount paid or the period over which payments were made was not established.

    On a periodic basis, ACE conducted a physical inventory of the cars on Triple A's lot. ACE conducted such an audit on October 25, 2016, in part because a check from Triple A to ACE had been returned for insufficient funds on October 21, 2016. Mr. Ferreira did not block or impair ACE's audit. Although Triple A and the Debtor provided some explanations for cars that were not present on the lot at the time of the audit, ACE concluded that Triple A had sold between 15 and 18 cars[1] floor planned by ACE without paying for them. The Debtor stated some cars had been sold for less than the debt. After the October audit, the Debtor and/or Triple A paid ACE almost $20,000 in cashier's checks and believed they had an arrangement with ACE to pay the balance due over two years. Nevertheless, in late 2016, ACE repossessed all the vehicles on Triple A's lot. The number of cars repossessed or the date of repossession was not disclosed. Some of those cars were not property of Triple A and were ultimately returned to their owners. On November 9, 2017, ACE obtained a judgment against Mr. Ferreira in the amount of $42,254.00

---

[1] Exhibit 3 states on the last page "There was a total of 18 vehicles NOT paid by Dealers". But Mr. Wantz, who testified on behalf of ACE, stated that there would be an "S" in a particular column if the vehicle had been sold. A review of Exhibit 3 shows only 15 of the vehicles with the indication "S".

3

plus $6,978.00 in interest and $4,948.20 in attorney's fees. It is this judgment which ACE seeks the Court to determine to be nondischargeable.

## CONCLUSIONS OF LAW

A presumption exists that all debts owed by the Debtor are dischargeable unless the party contending otherwise proves nondischargeability. 11 U.S.C. § 727(b). The purpose of this "fresh start" is to protect the "honest but unfortunate" debtors. U.S. v. Fretz (In re Fretz), 244 F.3d 1323, 1326 (11th Cir. 2001). The burden is on the creditor to prove an exception to discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287-88 (1991); St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 677 (11th Cir. 1993); Griffith v. U.S. (In re Griffith), 206 F.3d 1389, 1396 (11th Cir. 2000). Courts should narrowly construe exceptions to discharge against the creditor and in favor of the debtor. Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994); St. Laurent, 991 F.2d at 680. In the complaint, ACE alleged that its debt was nondischargeable under 11 U.S.C. §§ 523(a)(2), (a)(4) and (a)(6). At trial, however, ACE announced it was not pursuing nondischargeability under Section 523(a)(2), but only under Sections 523(a)(4) and (a)(6).

**Section 523(a)(4)**

ACE argues first that the debt is nondischargeable under Section 523(a)(4) because Mr. Ferreira committed fraud or defalcation while acting in a fiduciary capacity. ACE relies on Section 7.7 of the Agreement which provides as follows:

> Dealer shall hold as a fiduciary all amounts received from the sale of Lender-Financed Inventory in the form as received in trust for the sole benefit of Lender and shall remit funds satisfying all amounts due and owing Lender for the sold item of Lender-Financed Inventory within twenty-four (24) hours of receipt of said funds.

A fiduciary relationship under Section 523(a)(4) is to be construed narrowly. Quaif v. Johnson, 4 F.3d 950, 953 (11th Cir. 1993) (citation omitted). "Section 523(a)(4) requires that the

4

debtor, acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act, committed an act of fraud or defalcation." Estate of Newton v. Lemmons (In re Lemmons), 2005 WL 6487216, at *4 (Bankr. N.D. Ga. Dec. 20, 2005) (citation omitted). A technical trust has been defined by the Eleventh Circuit as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. Parker v. Ferland (In re Ferland), 2010 WL 2600588, at *3 (Bankr. M.D. Ga. June 21, 2010) (citation omitted); see also Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 816 (11th Cir. 2006). "Mere friendship does not meet this standard, nor does an ordinary business relationship." In re Ferland, 2010 WL 2600588, at *3 (citation omitted). Thus, a plaintiff must show that (i) the debtor held a fiduciary position *vis a vis* the plaintiff under a technical, express, or statutory trust; (ii) that the claim arose while the debtor was acting as a fiduciary; and (iii) that the claim is for fraud or defalcation. Gen. Ret. Sys. of the City of Detroit et al. v. Dixon (In re Dixon), 525 B.R. 827, 845 (Bankr. N.D. Ga. 2015).

A number of courts have considered whether contracts in a floor planning relationship create such a technical trust.  As the bankruptcy court explained in VW Credit, Inc. v. Salim (In re Salim), 2015 WL 1240000, at *14 (Bankr. E.D.N.Y. Mar. 16, 2015), "the use of the term 'trust,' without more, may not be enough."  Indeed, "courts are careful to distinguish between a debtor-creditor relationship with trust provisions imposed by the creditor to enhance collection of the debt, and a true fiduciary or trust relationship." In re Bowles, 318 B.R. 129, 142 (Bankr. E.D. Wis. 2004) (explaining that only "a debtor-creditor relationship existed" where trust terminology was used, "similar to that of a retailer who agrees to hold the collateral proceeds of his floor plan lender in trust"); see also Gravett v. Thompson (In re Thompson), 581 B.R. 300, 316 (Bankr. W.D. Ark. 2017) (explaining courts have been historically reluctant to construe a contract between a secured lender and a debtor as a trust for purposes of Section 523(a)(4), regardless of the language used by

5

the parties and finding, absent direction from the plaintiff regarding the basis for its allegation the debtor committed fraud or defalcation while acting in a fiduciary capacity, the debtor's duties to the bank were contractual rather than fiduciary in nature); Floorplan Xpress, LLC-OK v. Bagsby (In re Bagsby), 2017 WL 3084405, *4 (Bankr. W.D. Mo. July 18, 2017) ("Most secured lending agreements impose duties on the borrower in dealing with the creditor's collateral, but those duties seldom create a § 523(a)(4) fiduciary capacity."); NextGear Capital Inc. v. Mejorado (In re Mejorado), 605 B.R. 116, 124 (Bankr. N.D. Tex. 2019) ("Mere recitals in a document that an obligation is "in trust" alone will not establish a fiduciary relationship.")

In Salim, the court found that use of nomenclature, including the phrase "hold in trust," without more was not enough to create an express or technical trust in a floorplan contract. 2015 WL 1240000 at *17. Similarly, in In re Rifai, 604 B.R. 277 (Bankr. S.D. Tex. 2019), the court rejected the argument a trust had been created in an agreement which provided a car lot would "hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory . . .". The court concluded the agreement did not sufficiently establish a trust res and failed to require the debtor to segregate funds for the sole benefit of the plaintiff. Therefore, it failed to establish an express or technical trust. A similar floor plan agreement was rejected as a trust in Bagsby, 2017 WL 3084405. The agreement required the dealer to hold sales proceeds "in Trust" for the benefit of the lender and pay the lender all amounts due. The court granted summary judgment to the defendant, concluding the plaintiff did not identify a provision in the loan documents that created a trust relationship before the alleged wrong – the selling of the cars without remitting the proceeds. Accordingly, plaintiff failed to prove the defendants acted in a fiduciary capacity.

6

Where courts have determined that floor plan arrangements do create qualifying trusts, there have been more requirements in the underlying agreement. One of the primary provisions relied on in these cases is a requirement that the proceeds be segregated. For example, in <u>Kubota Tractor Corp. v. Strack (In re Strack)</u>, 524 F.3d 493, 495-96 (4th Cir. 2008), the contract required the proceeds to be segregated and held in trust, and the contract specifically provided when the proceeds could be transferred out of trust and used by the dealer. The facts were similar in <u>Commer. Cash Flow, LLC v. Matkins (In re Matkins)</u>, 2019 WL 3980775 (Bankr. E.D. Va. August 22, 2019). There, again, the agreement provided that payments on the invoices were to be held as a trustee of an express trust and to be held separately. The court held, under Virginia law, an express trust was created.

The section in the Agreement relied upon by ACE does not create an express trust. It does not establish Mr. Ferreira or Triple A as a trustee with specific fiduciary duties. There is no requirement in the Agreement that Triple A or Mr. Ferreira segregate the proceeds of the sale of vehicles, and the proceeds were never segregated. The Agreement requires the Dealer to maintain books and records but never refers to any particular method of accounting nor does it identify the proceeds of a vehicle sale as a trust res. Finally, even paragraph 7.7 relied upon by ACE belies the intent to create a express trust. On one hand it states the Dealer is a fiduciary and shall hold funds in the form received in trust for the sole benefit of the Lender, but nowhere is the Dealer required to remit the exact funds in the exact form to the Lender. The very next phrase states that the Dealer "shall remit funds satisfying all amounts due and owing Lender for the sold item" within 24 hours. So while the Agreement states that certain funds are to be held in trust, that trust res is not what is required to be paid to the Lender and in fact the Dealer is obligated to pay amounts due to the Lender on the sold vehicle, regardless of whether that sum is what the Dealer received.

7

The facts here are similar to those in Auto. Fin. Corp. v. Nunez (In re Nunez), 2019 WL 1271450 (Bankr. N.D. Tex. March 15, 2019).  With virtually identical language, the court held that it was not sufficient to create an express trust.  Virtually identical language was found insufficient to create a trust in Rifai, 604 B.R. at 325, and in Bagsby, 2017 WL 3084405, at*4. None of the agreements required the proceeds be segregated or contained other provisions indicating the agreement was a true trust as opposed to a debtor-creditor transaction.

Because the Agreement did not create an express or technical trust, Mr. Ferreira was not a fiduciary as that term is used in Section 523(a)(4) and his discharge is not barred pursuant to that section.

**Section 523(a)(6)**

ACE also claims that Mr. Ferreira's debt to ACE is nondischargeable under 11 U.S.C. § 523(a)(6).  Section 523(a)(6) excepts from discharge an individual's debts incurred by "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 523(a)(6) generally relates to torts and "may apply to a broad range of conduct causing harm to people . . . subject to the limitation the injury be 'willful and malicious.'" 4 Alan N. Resnik & Henry J. Sommer, Collier on Bankruptcy ¶ 523.12 (16th ed. 2017).

The term "willful" means intentional and deliberate; "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will." Lee v. Ikner (In re Ikner), 883 F.2d 986, 991 (11th Cir. 1989); Chrysler Credit Corp. v. Rebhan, 842 F.2d 1257, 1263 (11th Cir. 1998), *abrogated on other grounds by* Grogan v. Garner, 498 U.S. 279 10 (1991); Sunco Sales, Inc. v. Latch (In re Latch), 820 F.2d 1163, 1166 n.4 (11th Cir. 1987). The debtor, through his acts, must have actually intended the *injury*, "not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (emphasis in original). In other words, the debtor must have "desired the injury caused by his conduct." Atlanta

8

Contract Glazing, Inc. v. Swofford (In re Swofford), 2008 WL 7842040, at *2 (Bankr. N.D. Ga. Dec. 23, 2008). Not every intentional tort falls within the gamut of Section 523(a)(6), Miller v. J.D. Abrams, Inc. (In re Miller), 156 F.3d 598, 604 (5th Cir. 1998) ("[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful"), and conduct that is reckless is simply not enough to obtain relief under Section 523(a)(6). Smith v. Burgos (In re Burgos), 2015 WL 9435398, at *2 (Bankr. N.D. Ga. Nov. 9, 2015). The plaintiff must show the debtor "had a subjective motive to inflict injury or believed his conduct was substantially certain to cause injury." Hot Shot Kids, Inc. v. Pervis (In re Pervis), 512 B.R. 348, 376 (Bankr. N.D. Ga. 2014). The debtor's subjective intent may be inferred from surrounding circumstances. Id.

As stated above, to establish willfulness Mr. Ferreira must have actually intended the injury to ACE, not simply intended the act of using the sales proceeds to pay other expenses. The facts in this case show that Mr. Ferreira and Triple A made payments of almost $20,000 to ACE by cashier's checks after the audit showed the shortfall owed to ACE. Mr. Ferreira also testified without contest that he believed he had arranged with ACE for a payment plan for the remainder owed. Those are not the acts of one who intended to injure ACE.

Moreover, to establish that an act is malicious, it must be wrongful and without just cause. Several courts have decided that when the money that was not paid to a floor plan lender was used for the operation of the business as opposed to diverted, the act was not malicious. See Florida Outdoor Equipment v. Tomlinson (In re Tomlinson), 220 B.R. 134 (Bankr. M.D. Fla. 1998). There, the court focused on the fact the debtor reinvested the proceeds in his business and voluntarily surrendered the remaining inventory to the creditor when the creditor came for it. Similarly, in Mayfield Grain Co. v. Crump (In re Crump), 247 B.R. 1 (W.D. Ky. 2000), the court found the debtor's failure to remit proceeds subject to a security interest was not willful and

malicious where the debtor's intent was to keep his farming business afloat, there was no evidence of intent to harm, and there was significant evidence of the debtor's good intent. Likewise, in In re Wikel, 229 B.R. 6 (Bankr. N.D. Ohio 1998), the court found the debtor used the proceeds in an effort to preserve his business. The court noted that although the Debtor's actions of using the proceeds of collateral blatantly breached the security agreement, Section 523(a)(6) requires more than just a knowing breach of a contract.

This emphasis on how the debtor used proceeds is set out clearly in Ford Motor Credit Co. LLC v. Franceschini (In re Franceschini), 2012 WL 113337 (Bankr. S.D. Tex. January 12, 2012). There, the court held that as long as the debtor was reinvesting the proceeds from the sale of vehicles in the business, his acts were not willful or malicious. However, once he began to transfer the proceeds to affiliates and family members, the court found the efforts were no longer reasonable, and those funds were subject to being nondischargeable. This follows another Texas case, In re Grier, 124 B.R. 229, 232 (Bankr. W.D. Tex. 1990), where the court also determined the debt was dischargeable even though the debtor had used the proceeds of collateral in violation of the security agreement. The debtor's decision was based on his belief that monies would come in eventually from the business's cash flow and the creditor would be paid out of that cash flow. The court noted the debtor did not try to hide the fact he had sold the items and spent the next nine months after the revealing audit trying to find ways to repay the lender. The court drew a distinction between a violation of the security agreement and "something extra" that demonstrates the debtor acted without just cause or excuse. The court explained "[s]imply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of the debtor should not be enough to trigger a finding of malice. If this were the case, then merely intentional conduct would fall within this exception to discharge, and the term 'malicious' would be effectively read out of the statute." Id. at 233.

Here, Mr. Ferreira did violate the Agreement by not remitting the proceeds upon sale of the vehicles. However, the audit reflected the sales and Mr. Ferreira did not block or impair anyone's ability to conduct an audit. When the audit revealed the shortfall, he promptly paid a substantial sum of money to ACE by cashier's check and believed he had worked out a payment plan for the balance. Mr. Ferreira testified, without contest, that his business had previously been profitable and he expected it to return to profitability but he felt like he needed to pay his rent, pay for his business license, and pay some of the vendors who were doing work in the meantime. He did acknowledge paying himself $500 to $1,000/week. The evidence did not reveal the total amount paid to Mr. Ferreira, the period of time over which the payments were made, how the payments post-default compared to those pre-default or anything else about the payments. While this fact is relevant in considering the willful or malicious nature of his acts, given the relatively small amount used by the Debtor and the lack of additional evidence about the payments, the Court finds the Plaintiff has failed to carry its burden of showing Mr. Ferreira acted maliciously. Based on all of the facts, the Court concludes Mr. Ferreira's actions in not remitting proceeds to ACE were not willful and malicious and therefore the obligation to ACE is dischargeable.

**Damages**

Finally, the Court notes ACE failed to prove its damages arising from any of its allegations. The only evidence of damages submitted by the Plaintiff was its state court judgment. The judgment does not reveal how the amount due was derived, and no evidence was presented on the subject. Presumably, this was the amount due on the Debtor's guaranty. But the total amount due ACE is not necessarily the amount nondischargeable even if the Plaintiff proved its allegations. Section 523 provides that certain debt is not discharged, but it is only the debt arising from the acts described in Section 523 that is not dischargeable. Sometimes that may be the entire amount owed a creditor, but not always. For example, in Forsythe v. Yeley, 508 B.R. 82 (S.D. Ind. 2014), the

district court remanded the case to the bankruptcy court so the bankruptcy court could determine what amount of the money obtained by the debtor from the creditor was obtained through fraudulent conduct. As the court stated, "[o]nce this finding is made, that specific amount should be found to be non-dischargeable." Id. at 86. The court in Brown v. Kuwazaki (In re Kuwazaki), 438 B.R. 355 (B.A.P. 10th Cir. 2010), specifically considered the damage calculation arising under Sections 523(a)(4) and (a)(6) as a result of the debtor's alleged conversion and embezzlement. The court noted that damages for the acts complained of were limited to "money or property that was used in an unauthorized way, which means that … damages should not include any amounts that actually were used in accordance with the parties' agreement." The appellate court noted that it appeared the bankruptcy court had arrived at the judgment amount by using the unpaid amount of the loan because the damages "came to such a precise number, and more importantly, because it exactly matched the amount of the 2006 loan." The appellate court remanded the matter to the bankruptcy court to make specific findings on the amount of damages caused by the alleged conversion and embezzlement. See also Dwyer v. Kelley (In re Kelley), 2008 WL 8013409 (Bankr. S.D. Cal. July 15, 2008) (after determining a claim in some amount was non-dischargeable under Section 523(a)(4) and examining the specific amounts at issue to determine whether they were all non-dischargeable, plaintiff's claim was nondischargeable only to a limited extent.); Data Mountain Sols., Inc. v. Giordano (In re Giordano), 472 B.R. 313, 326 (Bankr. E.D. Va. 2012) (explaining the court was obligated to determine the extent to which an arbitration award was non-dischargeable – i.e., the amount of damages that may be non-dischargeable).

Here, if the Debtor breached a fiduciary duty by failing to remit sales proceeds to ACE as ACE claimed, the Plaintiff would need to show the amount of the proceeds diverted. The evidence was unclear as to how many cars were sold and NO evidence was presented as to the amount of proceeds received by Triple A. The Debtor testified some of the cars were sold for less than the

debt, so the sales proceeds seem to be less than the debt to ACE.  The debt also appears to include interest and fees, which are collectible under the Agreement, but not necessarily the result of a failure to remit proceeds, as opposed to a failure to pay a debt.  Similarly, if the Debtor acted "willfully and maliciously" by paying debts other than to ACE, it is the amount wrongly paid that is the damage, not the amount due on the Agreement.  No evidence was presented as to the total amount paid on other expenses after the failure to remit sales proceeds.  So, ACE's claim to make its entire debt nondischargeable also fails for lack of proof as to the amount of debt attributable to any actions that would make the debt nondischargeable.

### CONCLUSION

For the reasons stated above, judgment is entered for the Debtor/Defendant.

### ### END OF ORDER ###

**DISTRIBUTION LIST**

James W. Martin
Hays Potter & Martin, LLP
3945 Holcomb Bridge Rd, Ste 300
Peachtree Corners, GA 30092

Ariane Ferreira
2613 Myrtlewood Ln NW
Kennesaw, GA 30144-7400

Eric E. Thorstenberg
Eric E. Thorstenberg, Attorney at Law
333 Sandy Springs Circle, Ste 101
Atlanta, GA 30328